UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ANGELIQUE L. MAHOME and <br> VERONICA L. CLARK, <br><br> Plaintiffs, <br><br> v. <br><br> U.G.N., INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) NO. 2:23CV38-PPS <br> ) <br> ) <br> ) <br> ) |

**OPINION AND ORDER**

Angelique Mahome and Veronica Clark, both of whom are African American, worked in U.G.N., Inc.'s Human Resources Department, and allege that they were terminated together on July 7, 2022, based on their race and for opposing racist conduct by their supervisor, Kelly Smolinski. Their complaint against UGN contains claims for race discrimination and retaliation under both 42 U.S.C. §1981 and Title VII. UGN has filed a motion seeking summary judgment in its favor on all of Mahome's and Clark's claims.

Summary Judgment Standards

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654

(7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

I have considered the evidence of record cited in support of each parties' factual assertions. Fed.R.Civ.P. 56(c)(3). Also, at my option, I have considered other materials in the record. *Id*. Where either party claims to dispute an asserted and supported fact, but has not cited to evidence of record to support the dispute, or shown that the materials cited by the opposition do not support their assertion, I consider the asserted fact to be undisputed. Fed.R.Civ.P. 56(c)(1)(A) and (B). Several times UGN, attempting to dispute a fact asserted by plaintiffs, has cited some of the same deposition testimony as cited by plaintiffs in support of the fact. In those instances, I have reviewed the doubly-cited testimony to determine whether it supports the fact asserted or not.

Whether the fact is material is a determination I make separately. If I have determined an undisputed fact to be immaterial, I do not include it here. I must construe all facts in the light most favorable to plaintiffs, and view all reasonable inferences in their favor. *Biggs v. Chicago Board of Education*, 82 F.4th 554, 559 (7th Cir. 2023); *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020). Applying these principles and practices, the summary judgment determination is based on the following facts, either undisputed or disputed but construed in plaintiffs' favor.

Material Facts

UGN is a leading manufacturer of automotive acoustic, interior trim, and thermal management products, which operates facilities in Indiana and elsewhere. [DE 28 at ¶¶1, 2.] Plaintiff Angelique Mahome, who is African American, began working at UGN in 2019 when she was assigned there by a temporary staffing agency. [*Id.* at ¶3.] In February 2020, UGN made Mahome a full-time employee giving her the title Human Resources Assistant position in its Valparaiso, Indiana facility. Mahome reported to Kelly Smolinski, the Valparaiso plant's Human Resources Manager, who is Caucasian. [DE 28 at ¶4.]

At that time, Mahome had not completed her Bachelor's degree in Human Resources Management. [DE 31 at ¶92.] Mahome testified in her deposition to a belief that a Caucasian co-worker, Julie Sinchak, was paid significantly more than Mahome and given the title HR Generalist, even though she too had not yet earned a Bachelor's degree. [DE 22-2 at 110-111 (p.110, ℓ.16 - p. 111, ℓ.11).] Mahome complained to Kelly Smolinski about the disparate treatment. [DE 22-2 at 110-111 (p.110, ℓ.16 - p. 111, ℓ.11).]

Smolinski insisted that Mahome complete her Bachelor's degree before UGN would consider Mahome for a pay raise and promotion to HR Generalist. [DE 31 at ¶95.] In September 2020, after Mahome provided proof of her degree, Smolinksi promoted Mahome to the position of Human Resources Generalist, which included a pay raise. [DE 28 at ¶5; DE 22-2 at 112 (p.111, ℓℓ. 5-8).]

In 2016, a temporary staffing agency assigned plaintiff Veronica Clark to work on the "production pad line" at UGN's Valparaiso plant. [*Id.* at ¶6.] UGN hired Clark directly in 2017 for a full-time position on the line. [*Id.* at ¶7.] In 2020, Smolinski offered Clark a position as a Human Resources Intern. [*Id.* at ¶¶8, 10.] In 2021, Smolinski promoted Clark to the position of Human Resources Assistant, which included a pay raise. [*Id.* at ¶12.]

There is a dispute of fact created by Mahome's and Smolinski's deposition testimony over whether Smolinski required Mahome to enforce a ban on UGN employees wearing clothing with the "Black Lives Matter" slogan where no such prohibition applied to the "Make America Great" slogan or images of the Confederate flag. [DE 22-2 at 232-236 (pp. 231, $\ell$.22 - p.235, $\ell$.5); DE 22-3 at 96 (p.95, $\ell\ell$.9-21), 97 (p.96, $\ell\ell$.2-10), 98, (p.97, $\ell\ell$.5-19).] Mahome has testified that she questioned Smolinski about the unfairness of the lopsided policy. [DE 22-2 at 232-236 (pp. 231, $\ell$.22 - p.235, $\ell$.5).]

UGN hired a Caucasian man named Brandon for a production operator position. [*Id.* at ¶21; DE 22-2 at 90 (p.89, $\ell\ell$.10-11), 92 (p. 91, $\ell\ell$. 19-21).] UGN had received a criminal background check on Brandon that disclosed he had a felony conviction for sexual misconduct with a minor. [DE 28 at ¶22.] By contrast, when an African American applicant named Sam applied for a position with UGN, [*id.* at ¶27], and his background check revealed a criminal history, Smolinski told Mahome and Clark that Sam could not be hired because of his conviction. [*Id.* at ¶29.]

4

In 2021, UGN had a Caucasian employee named James. [DE 28 at ¶32; DE 22-6 at ¶10.] After a workplace accident on August 14, 2021, James was required by company policy to submit to a drug test. [DE 28 at ¶33.] The initial test produced a positive result for marijuana-cannabinoids. [*Id.* at ¶34.] James asked to be retested, claiming that he was on medication he believed would cause a false positive on the drug test. [*Id.*] James was retested, this time with a negative result. [*Id.*] UGN did not terminate James. [*Id.* at ¶36.]

After three months on the job, a UGN employee named Ryan also had a positive drug test after a workplace incident, and was terminated. [*Id.* at ¶37.] Ryan is African American. He admitted that he had smoked marijuana, did not claim his test was a false positive and did not ask to retake the test. [*Id.*] Mahome and Clark voiced complaints to Smolinski that it was unfair that James was not terminated but that Ryan was. [DE 28 at ¶37.]

Two African American employees, Dewayne Johnson and Taylor Holley complained to Clark about James (the Caucasian co-worker who'd had the positive drug test) making racially derogatory remarks around them. [*Id.* at ¶41.] Johnson attests that Clark put his race discrimination complaints against James in writing, and that he read and signed the document Clark prepared. [DE 27-4 at ¶8.] Clark claims that she added typed reports of the complaints to all three employees' personnel files, and informed Smolinski of the complaints. [DE 28 at ¶41, 42.] Smolinski claims she spoke to James, who denied making any such remarks. [*Id.* at ¶43.] UGN denies the existence of any

5

written record of Holley or Johnson ever registering a complaint about James. [*Id*. at ¶44; DE 22-1 at ¶7.]

James testified in his deposition that he was never disciplined based on race discrimination complaints against him, that he never knew that Johnson and Holley made complaints about his use of racially derogatory language, and that, even after Mahome and Clark filed their EEOC charge with allegations concerning James, no UGN employee ever interviewed James about whether he had used racist language or about plaintiffs' allegations. [DE 31 at ¶¶102-103.]

In March 2022, the Quality Department had an open supervisory position. [DE 28 at ¶46.] Jennifer Hendricks was the Manager of the Quality Department. [*Id*.] The three finalists identified for the position were James and two African American candidates named Sonja Chester and Tyrese Kuykendall. [*Id*. at ¶47.] At the time of the promotion decision, Hendricks was unaware of James' drug tests or the reports of his racially derogatory comments to African American co-workers. [*Id*. at ¶50.] Afterward, Mahome complained to Smolinksi that Hendricks' selection of James rewarded bad behavior, in light of his prior failed drug test and purposed use of racially offensive language. [*Id*. at ¶51.]

On Friday, June 17, 2022, Smolinksi was not present at the Valparaiso plant. [DE 28 at ¶64.] Smolinski has attested that she told Mahome and Clerk that, in her absence, they would need to cover the Human Resources Department that day. [DE 19-9 at ¶14.] Plaintiffs respond by asserting that they "were not instructed to stay at the office on June

6

17, 2022," but the deposition testimony they cite does not support that claim. [DE 32 at ¶64.] When an individual came to the plant needing assistance from Human Resources, Jennifer Hendricks, then the manager of the Quality Department, discovered that Mahome and Clark were absent. [DE 28 at ¶¶65, 66.]

Video surveillance footage taken at the plant showed that Mahome and Clark left together at 10:49 a.m. on June 17, and did not return until 12.55 p.m. that day. [DE 28 at ¶67.] The following week, Hendricks notified Smolinski that plaintiffs had left work on June 17 in the middle of the day without notifying anyone at the plant. [*Id.* at ¶68.] Plaintiffs left work that day in order for Mahome to seek a restraining order against her ex-husband and to make efforts to remove his name from the mortgage on their property. [*Id.* at ¶69.] Clark went along to support Mahome. [*Id.*] Mahome testified that certain other UGN office employees took extended lunch periods or left work early without repercussions. [DE 22-2 at 132-133, 134 (p. 131, ℓ.20 - p.132, ℓ.18, p.133, ℓℓ.5-9).] According to Mahome, there was no policy setting a particular length of time for the lunch period of salaried employees such as herself. [DE 22-2 at 134 (p.133, ℓℓ.7-21).]

Among the issues UGN says led to plaintiffs' termination is a dispute concerning Smolinski's access to what UGN calls "the second floor Human Resources office...where Plaintiffs' desks were located," but which plaintiffs refer to as "Mahome and Clark's office." [DE 28 at ¶72.] On June 23, 2022, Smolinski attempted to enter that office but her electronic badge did not give her access. [DE 28 at ¶72.] Mahome testified that on that occasion she immediately opened the door and allowed Smolinski entry. [DE 22-2

7

at 176 (p.175, ℓℓ.11-19).] Smolinski had her own office on the first floor, which Smolinski could lock. [DE 22-3 at 106-107 (p.105, ℓℓ.18-25).] Plaintiffs also contend that UGN had no policies forbidding employees from locking their offices when they were away from the facility. [DE 22-2 at 199 (p.198 at ℓℓ.6-8).]

A report generated by the software system that controls electronic badge access and modifications reflects that Clark had removed Smolinski's access to the office on June 21, 2022, and that someone logged in as "angelique.mahome" removed Smolinski's access to the office on June 23, 2022. [DE 28 at ¶74.] Clark testified that she had "caught" Smolinski "snooping through our office twice" in plaintiffs' absence, including pulling on locked desk drawers. [DE 22-5 at 149 (p.148 at ℓℓ.1-6).] Clark acknowledges that she removed Smolinski's access to plaintiffs' office after seeing her "snooping." [DE 22-5 at 142-143 (p.141,ℓ.24-p.142,ℓ.2).] Mahome denies that she ever took any action to remove Smolinski's badge access, and has testified that several others (including Smolinski) had Mahome's login information for the badge software system. [DE 22-2 at 175 (p.174,ℓℓ.11-15), 177 (p.176, ℓℓ.1-6).]

On July 1, 2022, Smolinski and Hendricks met with Mahome and Clark separately to address their two-hour absence on June 17 and their apparent tampering with Smolinski's badge access to the second floor Human Resources office. [DE 28 at ¶75.] Mahome admitted that plaintiffs had left work for two hours on June 17, 2022 but repeated her previous denial that she had removed Smolinski's badge access, despite being shown the report that showed "angelique.mahome" had de-authorized

8

Smolinski's access on June 23. [*Id.* at ¶76.] For her part, Clark did not deny removing Smolinski's access to the office on June 21, and did not deny leaving work for two hours on June 17 without punching out. [*Id.* at ¶78.]

Smolinski placed Mahome and Clark on paid suspensions pending further investigation. [*Id.* at ¶79.] Smolinski testified that Mahome and Clark were "told to keep confidential their suspension." [DE 22-3 at 113 (p.112, ℓℓ.11-15).] On cross-examination by UGN's counsel, Smolinski testified that her communication to plaintiffs about confidentiality "would have been phrased like a request," rather than an order or mandate. [*Id.* at 117 (p.116, ℓℓ.4-15).]

On July 7, 2022, Smolinski and plant manager Steve Boudrie called each plaintiff separately by telephone to inform them that UGN had completed its investigation was terminating their employment. [DE 28 at ¶80.] According to UGN, the decision to terminate Mahome and Clark was made jointly by Smolinski, Boudrie, and Shelly Green, UGN's Vice President of Human Resources. [*Id.* at ¶81.]

In her declaration, Smolinski asserts that she supported the terminations of Clark and Mahome based on her honest beliefs that: (a) plaintiffs had deliberately left work in the middle of the workday for more than two hours on June 17, 2022 without notifying anyone and without securing anyone else to cover the Human Resources Department; (b) Clark failed to punch out when she left and received pay for time she did not work; (c) plaintiffs had, without authorization, removed Smolinski's badge access to the second

9

floor Human Resources office; and (d) Mahome had repeatedly lied about removing Smolinski's badge access. [DE 28 at ¶85; DE 22-6 at ¶22.]

Smolinski acknowledged that UGN did not generally track whether or for how long its office employees took a lunch break. [DE 22-3 at 102-103 (p. 101, ℓ.24-p.102,ℓ.3).] Smolinski was also unaware of any administrative office employees ever being disciplined for taking over-long lunch breaks, for arriving late to work, or for leaving work early. [DE 22-3 at 104 (p.103, ℓℓ.3-7).]

## Discussion

As the Seventh Circuit made clear in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), "the correct standard on summary judgment in this employment discrimination case is simply whether the evidence would permit a reasonable factfinder to conclude that [plaintiffs'] race caused the termination." *Owens v. Old Wisconsin Sausage Company, Incorporated*, 870 F.3d 662, 666 (7th Cir. 2017). In making this determination, distinctions are not to be made between so-called "direct" and "indirect" evidence. *Ortiz*, 834 F.3d at 765. The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973), can still be used as a means to "organize, present, and assess evidence in discrimination cases." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). But plaintiffs are not required to meet the *McDonnell Douglas* standards to survive summary judgment, but instead "may prove discrimination in a holistic fashion." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023).

Plaintiffs here make plain that they are relying on the "holistic" approach, offering circumstantial evidence they believe supports findings of intentional race discrimination against them, as well as retaliation for their prior complaints about race discrimination against others by UGN. [DE 27 at 2, citing *Wince*, 66 F.4th at 1040.] Viewing the evidence in the light most favorable to Mahome and Clark, I conclude that a reasonable factfinder could find that their race was the reason for Mahome's and Clark's terminations, and that they were retaliated against because they had complained of what they saw as racially discriminatory conduct at UGN. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021).

"The legal analysis for discrimination claims under Title VII and §1981 is identical," allowing for discussion of the two claims to be merged. *Smith v. Chicago Transit Authority*, 806 F.3d 900, 904 (7th Cir. 2015). The same is true for retaliation claims under the two statutes. *Miller v. Chicago Transit Authority*, 20 F.4th 1148, 1155 n.2 (7th Cir. 2021). To succeed on a claim that they were terminated because they are African American, Mahome and Clark must persuade a jury that their race "caused the discharge." *Ortiz*, 834 F.3d at 765. The "'sole question that matters'" is "whether a reasonable jury could conclude that [plaintiffs] suffered the adverse employment action because of [their] membership in a protected class." *Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022), quoting *Ortiz*, 834 at 763-64.

In order survive summary judgment on their retaliation claims, Mahome and Clark must show evidence on which a reasonable jury could find that they engaged in

11

statutorily protected activity, that materially adverse action was taken against them by UGN, and of a causal connection between the two. *Adebe v. Health and Hospital Corporation of Marion County*, 35 F.4th 601, 607 (7th Cir. 2022). Circumstantial evidence may be relied on to "supply the causal link...from which a jury may infer intentional discrimination." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). "Relevant circumstantial evidence may include 'suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual.'" *Rozumalski v. W.F. Baird & Assoc., Ltd.*, 937 F.3d 919, (7th Cir. 2019), quoting *Greengrass*, 776 F.3d at 486. "Regardless of the type of evidence presented, [t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action.'" *Gnutek v. Illinois Gaming Board*, 80 F.4th 820, 824 (7th Cir. 2023), quoting *Rozumalski,* 937 F.3d at 919.

On the record before me, here are the facts and inferences that defeat summary judgment in UGN's favor.

- Mahome testified that she "realized" a Caucasian HR Generalist was making more money even though she didn't have a degree in HR and didn't have prior experience. [DE 22-2 at 111 (p.110, ℓℓ.16-21).] Mahome complained to Smolinski about being required to finish her degree in order to receive the promotion to Generalist and accompanying pay raise, even

though the Caucasian Generalist "wasn't under the same standards." [*Id.* at 112 (p.111,ℓℓ.5-20).]

- Mahome testified that Smolinksi directed that the "Black Lives Matter" slogan was not permitted at UGN but that there was no similar prohibition on politically conservative slogans such as "Make American Great Again" or images of the Confederate flag. Mahome challenged these policies with Smolinski.

- Smolinski testified that Mahome and/or Clark argued against UGN's decision to hire Brandon, a Caucasian with a prior felony conviction for sexual misconduct with a minor, and complained that it was disparate treatment compared to the decision not to a hire an African American candidate with a lesser conviction.

- Mahome and Clark complained to Smolinski about the immediate firing of a black employee who tested positive for marijuana but the dissimilar treatment of a white employee who was given a retest and was not fired.

- Clark has testified that two black employees complained to Clark that James used racially derogatory language at UGN. James is the same white worker who was allowed a second drug test and not fired after testing positive for marijuana. Although Clark and one of the complaining employees have testified about writing up the issue, UGN denies that there exists any such record. James has testified that he was never questioned

13

about the allegations, despite Smolinski claiming that she spoke to him about them, and he denied them.

- James was later promoted over two African American candidates for a supervisory position, despite his history with the failed drug test and complaint of racial slurs, which were ignored for purposes of promotional consideration. Mahome mentioned the racism complaints about James to the decisionmaker, and later complained to Smolinski about the decision to promote James.

- UGN's reliance on plaintiffs' 2-hour absence on June 17, 2022 gives rise to reasonable assertions of pretext, given plaintiffs' testimony about the lack of a lunch policy and the frequency of other front office employees taking extended lunch periods with no adverse consequences.

- UGN's reliance on the badge access issue also doesn't carry the day for summary judgment. In the absence of any policy violated by a temporary "locking" of what Mahome and Clark considered "their" office, the matter frankly seems too trivial to conclusively ward off plaintiffs' assertion that the issue is pretext for race discrimination and retaliation. UGN cites Mahome's "lying" to her supervisor about tampering with her keycard. [DE 17 at 28.] But Mahome's continued persistence in her denial of responsibility merely creates a dispute of fact.

14

"Trials are stories, not syllogisms," and juries are allowed "to infer a great deal without mathematical precision." *Joll v. Valparaiso Community* Schools, 953 F.3d 923, 928 (7th Cir. 2020). As a result, a court considering a summary judgment motion "must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Id*. The circumstances I've identified could support a reasonable jury's determination that UGN, and Smolinski in particular, treated white employees more favorably than African-American ones, and that Mahome and Clark had regularly complained to Smolinski about decisions and policies that betrayed that favoritism. The evidence could lead a jury to return verdicts in favor of Mahome and Clerk for race-based determination and/or retaliatory termination.

## Conclusion

My sole function in deciding a motion for summary judgment is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). I cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of any matter in controversy, because those functions are for a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Johnson*, 892 F.3d at 893-94. Construing facts and reasonable inferences in favor of plaintiffs, I have considered the undisputed facts and the circumstantial evidence on which plaintiffs rely, as "all evidence belongs in a single pile and must be evaluated as a whole." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021). Taken together, the evidence would permit a

15

reasonable jury to infer "an overall likelihood" of race discrimination and retaliation that merits a trial. *Ortiz*, 834 F.3d at 763.

**ACCORDINGLY:**

Defendant U.G.N., Inc.'s Motion for Summary Judgment [DE 16] is DENIED.

**SO ORDERED**.

ENTERED: April 2, 2024.                /s/ Philip P. Simon
                                       **UNITED STATES DISTRICT JUDGE**